# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| PHIL TOWNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 4:13-CV-1703-VEH |
| | ) |
| KOCH FARMS, LLC, et al., | ) |
| | ) |
| Defendants. | ) |

---

## MEMORANDUM OPINION

## I.   INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff Phil Townson ("Mr. Townson") initiated this lawsuit against Defendant Koch Farms, LLC ("Koch"),[1] in the Circuit Court of DeKalb County, Alabama, on August 5, 2013. (Doc. 1-1 at 5).[2] The parties' dispute arises out of their commercial chicken dealings. (*See generally* Doc. 1-1). Koch removed the lawsuit to federal court on September 12, 2013, on the basis of diversity jurisdiction. (Doc. 1 at

---

[1]  CM/ECF currently reflects that Mr. Townson has sued two defendants: Koch Farms, LLC and Koch Farms of Chattanooga. Because Koch Farms, LLC has indicated on summary judgment that Koch Farms of Chattanooga is not a separate entity, but rather is merely a doing business as name, the court entered an order (Doc. 33) on November 13, 2014, directing Mr. Townson to show cause why Koch Farms of Chattanooga should not be terminated as a party defendant. Mr. Townson has not yet responded to this order, but the deadline for him to do so does not run until December 3, 2014. Consequently, to the extent that Koch Farms of Chattanooga is still a properly named defendant in this lawsuit, the court's decision on summary judgment applies equally to it.

[2]  All page references to Doc. 1-1 correspond with the court's CM/ECF numbering system.

1; *id.* 2 ¶ 2).

Mr. Townson's complaint originally contained seven counts, but after this court's memorandum opinion and order (Doc. 16) entered on April 22, 2014, only Count One for breach of contract (Doc. 1-1 at 8) and Count Five for tortious interference with a business relationship (Doc. 1-1 at 11) remain in the lawsuit. (Doc. 16 at 8).

Pending before the court is Koch's Motion for Summary Judgment (Doc. 27) (the "Motion") filed on September 3, 2014. The Motion seeks a dismissal of Counts One and Five. (Doc. 27 at 1). Koch filed a brief and evidence in support of its Motion (Doc. 28) on September 3, 2014.[3]

Mr. Townson opposed the Motion (Docs. 30, 31)[4] on September 24, 2014, and Koch followed with its reply (Doc. 32) on October 7, 2014. Accordingly, the Motion is now ready for disposition and, for the reasons explained below, is due to be granted in part and otherwise termed as moot.

---

[3]  All page references to Doc. 28 correspond with the court's CM/ECF numbering system.

[4]  All page references to Doc. 30 correspond with the court's CM/ECF numbering system.

## II.   FACTUAL BACKGROUND[5]

### A.   Koch and the Integrated Poultry Business

Koch is part of an integrated poultry process that takes chicken from the stage of being hatched from an egg to being slaughtered and processed so that it is ready to eat. AF No. 1.[6] Koch places chicks with farmers (also known as "growers"), such as Mr. Townson, to raise the chicks. AF No. 2. Koch buys the chicks from third-party suppliers and retains ownership of them while the grower raises them. AF No. 3.

---

[5]   Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

[6]   The designation "AF" stands for admitted fact and indicates a fact offered by Koch that Mr. Townson has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case. Under appendix II of the court's uniform initial order (Doc. 5) entered on September 13, 2013, "[a]ll statements of fact must be supported by specific reference to evidentiary submissions." (*Id.* at 16). For Mr. Townson, more specifically, this means that "[a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." (*Id.* at 17). Consequently, whenever Mr. Townson has inadequately asserted a dispute over a fact that Koch have otherwise substantiated with an evidentiary citation, the court has reviewed the cited evidence and, if it in fact fairly supports Koch's factual assertion, has accepted Koch's fact. On the other hand, whenever Mr. Townson has adequately disputed a fact offered by Koch, the court has reviewed the evidence cited by Mr. Townson and, if it in fact fairly supports Mr. Townson's factual assertion, has accepted Mr. Townson's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Koch's statement of undisputed facts as set forth in Doc. 28 and responded to by Mr. Townson in Doc. 30. Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

Koch provides all of the feed, medicine, and vaccinations for the chicks, and pays the grower an agreed-upon rate for raising the chicks. AF No. 4.

The chicks grown on Mr. Townson's farm are known in the industry as "pullets." AF No. 5. Pullets are raised to lay eggs that will hatch. *Id.* After hatching, those chicks then become broiler birds that are grown to be slaughtered and eaten. *Id.* Pullets are of particular importance because they are the ultimate source of chicken to be processed and sold. AF No. 6.

Due to their special breeding, pullets must be raised in a very controlled environment. AF No. 7. More specifically, Koch requires its growers to follow strict programs regarding the amount of light the pullets receive each day, the amount and timing of food and water the pullets receive, and the proper temperature, humidity and litter (*i.e.*, floor) conditions. AF No. 8. These programs directly promote the well-being of the pullets and maximize the number of eggs they will later lay. AF No. 9.

Koch monitors the progress of the pullets closely through the use of field technicians that regularly visit the farms and prepare inspection reports detailing the condition of the birds and the grower's compliance with the growing programs. AF No. 10. Mike Hoggard ("Mr. Hoggard"), the pullet technician from Koch responsible for overseeing Mr. Townson's last flock of pullets, visited Mr. Townson's farm at

4

least once per week, and sometimes three or four times per week. AF No. 11.

Koch estimates that, for a farm the size of Mr. Townson's, it had approximately $660,000 invested in the birds by the time that livestock was ready to be moved to "breeder" or "laying" houses. AF No. 12

### B.    Mr. Townson's Purchase of a Pullet Farm and Related Commercial Relationships

Mr. Townson bought a pullet farm in Ider, Alabama from Joel and Amanda Garner in 2008. AF No. 13. Mr. Townson obtained financing for that farm purchase from First Bank of the South ("FBS"), which loan was partially guaranteed by the Farm Service Agency ("FSA") of the United States Department of Agriculture. AF No. 14. Prior to approving that financing for Mr. Townson, FBS required Koch to provide a letter announcing that it intended to place chickens on his farm. AF No. 15. Koch provided FBS with this letter of intent, and Mr. Townson admits he would not have been able to get the loan from FBS to acquire the farm without it. AF No. 16.

As additional security for the loan, FBS also required Mr. Townson to execute an assignment to FBS of Koch's payments owed to him, and for Koch to sign an acknowledgment of that assignment. AF No. 17. Pursuant to that agreement, Koch provided FBS with Mr. Townson's compensation for raising the pullets, and FBS would, in turn, use a portion of that remittance to apply to Mr. Townson's loan

obligation. AF No. 18. Consequently, FBS was aware of the poultry growing arrangement between Mr. Townson and Koch. AF No. 19.

Mr. Townson's farm, also known as "Heaveni Farm," consisted of six pullet houses and one male house. AF No. 20. The six pullet houses contained approximately 10,000 pullets each, and the one male house contained approximately 5,000-8,000 fowl. AF No. 21. Thus, as a whole, Mr. Townson's farm could house approximately 65,000 to 68,000 chickens at a time. AF No. 22. Each flock would stay on Mr. Townson's farm for approximately six months. AF No. 23.

Koch and Mr. Townson would execute four separate, but similarly worded,[7] contracts for each flock grown on Mr. Townson's farm. (Doc. 28-6 at 56);[8] (Doc. 28-7 at 32 at 124).[9] More specifically, a separate contract existed for houses 1 and 2, another for houses 3 and 4, another for houses 5 and 6, and one for house 7. (Doc. 28-6 at 56).This series of separate contracts was necessary because Koch typically delivered and picked up the pullets two houses at a time in an effort to match schedules with vacancies in the breeder houses, another stage of the integrated poultry process. (*See* Doc. 28-7 at 32 at 123 (explaining series of contracts in

---

[7] The price Mr. Townson was to receive from Koch for his growing services would vary.

[8] All page references to Doc. 28-6 correspond with the court's CM/ECF numbering system.

[9] All of the first page references to Doc. 28-7 correspond with the court's CM/ECF numbering system.

conjunction with Koch's delivery and pick up of birds and how breeder farms typically consist of only two houses)).

Each pullet agreement regularly and expressly provides that its terms and conditions "will remain in effect until 1 Flock unless terminated pursuant to this Contract." (Doc. 28-12 at 6 ¶ 16).[10] Thus, each pullet agreement automatically terminated once Mr. Townson grew "1 Flock" from chicks to pullets. Each pullet agreement also prohibits any oral amendments. *Id.* Instead, "[m]odification . . . may only be accomplished by written instrument fully executed by the Producer and an authorized representative of the Company." *Id.*

### C. Koch Becomes Concerned about Its Commercial Relationship with Mr. Townson and Conditions Providing Him with Future Flocks upon Making Certain Repairs and Adjustments to His Farm.

Although Mr. Townson denies Koch's criticisms of his performance as a pullet grower, Koch asserts that it became dissatisfied with Mr. Townson's services for a variety of reasons. For example, on or about July 29, 2011, Mr. Hoggard, Jim Marsh ("Mr. Marsh") (Breeder Hatchery Manager for Koch), and Ed Poucher ("Mr. Poucher") (Chattanooga Live Operations Manager) visited Mr. Townson's farm and, according to Mr. Marsh, found the conditions to be disturbing. AF No. 29.

---

[10] All page references to Doc. 28-12 correspond with the court's CM/ECF numbering system.

Koch also met with Mr. Townson on August 11, 2011, and showed him photos of what it deemed to be illustrative of the poor conditions on his farm. AF No. 30. During this meeting, Koch provided Mr. Townson with a "punch list" of corrections that it required him to make to each of the seven houses before Koch would place additional birds on his farm. AF No. 31. Koch provided this list to Mr. Townson around the middle of the last set of written contracts, which were the ones executed in March 2011. AF Nos. 32, 33. In a letter dated August 17, 2011, from Mr. Marsh to Mr. Townson, Mr. Marsh documented what the parties had discussed during their August 11, 2011, meeting, including the requirement that "all of the items on the housing and equipment list must be corrected prior to the next placement of birds." AF No. 34.

After the punch list was provided to Mr. Townson, the following status with respect to his repair efforts were observed and documented according to Mr. Hoggard:

> a)   On October 18, 2011, the floors were not finished, the interior floors were below exterior grade, and Mr. Hoggard could see under the walls in many places. Litter from the previous flock in houses 5-7 had not even been completely cleaned out yet;
>
> b)   On November 16, 2011, low areas were in houses 1-3 and continuing drainage problems existed. Mr. Hoggard stated at the end of his report from this visit, "Phil, Call me when you are ready for me to come back and check.";

c)      As of December 12, 2011, none of the floors had been approved in any of the houses, and the floors in houses 5-7 had still not been completely cleaned out from the last flock. Mr. Townson had not replaced the drops yet either;

d)      Mr. Townson did not close on a loan for some of the repairs until February 12, 2012, more than six months after the punch list was provided; While Mr. Townson started working on some of the punch items shortly after he received the list from Koch, other repair attempts were not even started until after the loan closed;

e)      On March 1, 2012, the floors had gotten worse, and none of them passed the inspection. Mr. Townson also failed to appear at this scheduled meeting; and

f)      On or about May 12, 2012, Mr. Hoggard provided Mr. Townson with a list of repairs that Townson had yet to complete in each house. Such repairs included, among other things, fixing drinker frames, installing heaters, leveling feeders, fixing light leaks, moving water supply lines, fixing vent doors, fixing holes in the ceiling, and fixing feed corners.

AF No. 38 ¶¶ a-f.[11]

Additionally, on or about July 16, 2012, nearly a year after the punch list had been provided to Mr. Townson, a vendor that was installing heaters at Mr. Townson's farm called him to report that someone had stolen all the wiring from each chicken house. AF No. 39. The stolen items included all copper wiring for the lighting

---

[11] Mr. Townson admits that Mr. Hoggard so testified. Nevertheless, without citing to any on-point opposing evidence, Mr. Townson vaguely and otherwise ineffectively attempts to contest the validity of Mr. Hoggard's testimony or other evidence offered by Koch to support its version of the facts. Therefore, these facts are admitted by Mr. Townson on summary judgment.

fixtures, all light bulbs, all light fixtures, and all copper wiring to the fans in each house. AF No. 40. More than 21,000 feet of lighting wire alone was stolen. AF No. 41. As a result of the theft, Mr. Townson, by his own admission, was not able to take any birds even if he had completed the punch list. AF No. 42. Further, until the wiring was repaired, Mr. Townson could not even continue his work on the punch list due to a lack of any lighting in the houses. AF No. 43.

Mr. Hoggard and Mr. Marsh scheduled a meeting with Mr. Townson on November 27, 2012, to re-evaluate the farm due to the passage of time since he had last housed chickens. AF No. 44. When Mr. Hoggard and Mr. Marsh arrived for the meeting, they learned from Chuck Bowman ("Mr. Bowman"), a friend of Mr. Townson who had helped with some of the poultry growing on the farm, that Mr. Townson could not attend the meeting due to an out of town work conflict.[12] AF No. 45. Mr. Bowman also explained that he could not get the generator working for houses 1-4 due to a bad battery, and that the generator for houses 5-7 would not run due to the copper fuel line having been stolen. AF No. 46.

### D.   Koch Permanently Ends Its Commercial Relationship with Mr. Townson.

A re-evaluation of conditions on the farm occurred on December 11, 2012, at

---

[12]   As Mr. Townson explains, "he was forced to seek other employment to provide for his family after Koch refused to deliver the next flock of birds." (Doc. 30 at 6 ¶ 35).

which time Mr. Townson, Mr. Hoggard, and Mr. Marsh walked through houses 1-4. AF No. 47. By this time, the houses had been empty for over one year and had deteriorated further. AF No. 49. A chicken house that is idle begins oxidizing, or rusting, "immediately." AF No. 50.

As Mr. Townson himself noted, doors had fallen off the houses, the drinkers had become inoperable sometime during the first year of being empty, and some of the work he had done on the punch list had become "irrelevant." AF No. 51. Mr. Marsh thereafter informed Mr. Townson, in a letter dated December 12, 2012, that, due to the further deterioration of the farm's status, it would be necessary for Mr. Townson to complete a revised list of repairs before Koch could supply him with another flock of poultry. AF No. 52.

Koch also informed Mr. Townson in this correspondence that, before any corrective actions are taken, he would need to meet with Koch to obtain approval of a plan. AF No. 53. The revised list included such items as continuing to fix the floors and ceilings, replacing and rehanging feeders, replacing water supply lines and drinkers, replacing heaters, cleaning and removing debris from the light traps, and fixing light leaks. AF No. 54.

At the time Mr. Townson received the December 12, 2012, letter, he still had not completed all of the repairs from the original punch list Koch gave to him in

August 2011. AF No. 55. By Mr. Townson's own admission, he never repaired the feeders in house seven, never ran the feeders in the presence of a Koch representative, and never had his scales calibrated by a vendor. AF No. 56.

Mr. Townson also admits that he had not finished installing heaters in accordance with the punch list by the time the copper wire theft occurred in July 2012, and he does not believe that he finished replacing leaking supply lines. AF No. 57. Mr. Townson further concedes that he never did any of the items listed in the December 12, 2012, letter because he "could no longer afford to make the constant and expensive upgrades Koch continued to demand of him." (Doc. 30 at 8 ¶ 59).

The houses remained empty and, according to Mr. Townson, inoperable. AF No. 60. Because Mr. Townson did not respond to the December 2012 letter as requested, Koch sent another letter to him on March 13, 2013, informing him that Koch was permanently discontinuing the placement of chickens on his pullet farm. AF No. 61. Mr. Townson's lawsuit followed about five months later.

## III.    RULE 56 STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th

Cir. 1993).[13] A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)). Finally "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp*, 456 F.3d at 1274 (citing *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

## IV.   ANALYSIS

### A.   Mr. Townson's Breach of Contract Claim

An ordinary breach of contract claim arising under Alabama law requires proof

---

[13] Rule 56 was amended in 2007 in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

of the following elements:

> (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages.

*Southern Medical Health Systems, Inc. v. Vaughan*, 669 So. 2d 98, 99 (Ala. 1995)

(citing *McGinney v. Jackson*, 575 So. 2d 1070, 1071-72 (Ala. 1991)). Koch contends

that it is entitled to summary judgment on Count One of Mr. Townson's complaint

because no dispute exists that Koch fully performed under the parties' last collection

of written contracts executed in March 2011 and that no reasonable jury could

conclude that Mr. Townson completed the requested repairs or otherwise satisfied the

conditions precedent to the formation of another breeder pullet contract with Koch.

(Doc. 28 at  25-32).

Mr. Townson counters that Koch demanded material and excessive changes to

his farm "in direct violation of paragraph 16 [*i.e.*, the modification provision] in the

contracts . . . ." (Doc. 30 at 21). Mr. Townson also points out that "Koch's demands

on [him] were made <u>during</u> the performance of the last set of contracts." (Doc. 30 at

21 (emphasis in original)). Thus, Mr. Townson resists Koch's characterization of the

requirements placed on him as conditions precedent to the formation of a new set of

contracts. In sum, Mr. Townson urges that "[t]here is a question of material fact as to

whether the demand for upgrades were conditions precedent to a new set of contracts

14

or whether they were a breach to the existing contract." (Doc. 30 at 22).

Alternatively, Koch maintains that, even if material factual disputes exist as to whether a new contract for growing additional chickens was formed by the parties and whether a breach of that agreement occurred, Mr. Townson's recovery for damages would be limited to his lost profits attributable to just one flock. (Doc. 28 at 32-34). In making this argument, Koch relies upon the Supreme Court of Alabama's decision in *Goolesby v. Koch Farms, LLC*, 955 So. 2d 422 (Ala. 2006) ("If allowed to recover both the lost contract income and reliance damages, the Goolesbys would be placed in a better economic position than if there had been full performance of the grower contract.").

As for Koch's alternative position on summary judgment, Mr. Townson maintains that his damages should not be limited to his lost income for one flock of chickens. Instead, he contends that *Goolesby* does not preclude him from seeking damages beyond lost profits, including reliance damages in the form of a payoff on his loan(s) with FBS. In particular, Mr. Townson points out that because there was no objection made to the trial court's instructing the jury that the plaintiffs' expectation interest under the poultry contract was the (only) appropriate manner to measure their damages, the damages issue is <u>not</u> so firmly decided by *Goolesby* as Koch otherwise suggests. (Doc. 30 at 24); *see Goolesby*, 955 So. 2d at 429 ("Because

the Goolesbys failed to object to that instruction, <u>it became the law of the case</u>."
(emphasis added) (citing *Tolar Constr., LLC v. Kean Elec. Co.*, 944 So. 2d 138, 146
(Ala. 2006))).

Turning first to the viability of Mr. Townson's breach of contract claim, Mr.
Townson does not allege (much less substantiate with any proof) that Koch withheld
the delivery of any chickens that were due to him under the March 2011 series of
contracts on account of his failure to address the punch list and make other repairs to
the farm. Instead, even a reading of the record in the light most favorable to Mr.
Townson confirms that the parties' dispute was over the withholding of future
flock(s), not the previously negotiated and agreed-to flock covered by the March
2011 written contractual arrangement.

The court also observes that Mr. Townson's opposition is devoid of any case
law which confirms that the punch list and other requirements placed on Mr.
Townson before Koch would deliver any future flock(s) to him constitute a breach
of the parties' preexisting written agreement merely because of a no oral
modifications clause contained in those contracts. (Doc. 30 at 19-22). The absence
of any cited authority means that this court is not even obligated to address such an
underdeveloped and strained proposition. *Cf. Flanigan's Enters., Inc. v. Fulton
County, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an

argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument); *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to authority is insufficient to raise an issue before the court).

Additionally, Mr. Townson makes no effort to discuss, refute, or distinguish those Alabama authorities relied upon by Koch to support its condition precedent affirmative defense. (Doc. 28 at 26-27). For example, *CAM Investments, LLC v. Totty*, 128 So. 3d 749 (Ala. Civ. App. 2013), explains:

> A condition precedent is "'[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises.'" *Lemoine Co. of Alabama, L.L.C. v. HLH Constructors, Inc.*, 62 So. 3d 1020, 1025 n.5 (Ala. 2010) (quoting *Black's Law Dictionary* 312 (8th ed. 2004)). Because the failure of the occurrence of a condition precedent is an affirmative defense, *see Winkleblack v. Murphy*, 811 So. 2d 521, 529 (Ala. 2001); Rule 8(c), Ala. R. Civ. P., Totty bore " ' "the burden of making a *prima facie* showing that [he was] entitled to summary judgment" ' based on this defense." *Richardson v. Terry*, 893 So. 2d 277, 285 (Ala. 2004) (quoting *Ex parte General Motors Corp.*, 769 So. 2d 903, 909 (Ala. 1999), quoting in turn *Berner v. Caldwell*, 543 So. 2d 686, 691 (Ala.1989) (Houston, J., concurring specially)).

*CAM*, 128 So. 3d at 753.

Further, the Supreme Court of Alabama has clarified that "[a] condition precedent may relate either to the formation of a contract, or to liability under it." *Fidelity & Cas. Co. of New York v. DeLoach*, 195 So. 2d 789, 793 (Ala. 1967) (citing

Williston, *Contracts*, Sec. 666A, 3d ed.).

Here, the court concludes that Koch has made a *prima facie* showing that it is entitled to summary judgment on the affirmative defense of Mr. Townson's failure to satisfy several condition precedents either as they apply to the formation of a new set of flock contracts or, to the extent a post-March 2011 contractual arrangement was formed by the parties, as they operate to trigger Koch's obligation to deliver a new flock of chickens to Mr. Townson under that oral agreement. Koch having met this *prima facie* hurdle, it was incumbent upon Mr. Townson to point out to the court proof from which a reasonable jury could reject the merits of Koch's affirmative defense and find instead that Mr. Townson had complied with or, at least substantially satisfied, most of these conditions precedent.

Mr. Townson does not do this. Instead, while he complains that many of the demands placed upon him by Koch were excessive and unreasonable,[14] he ultimately boils the court's summary judgment decision down into one of determining whether a question of material fact exists as to "whether the demand for upgrades were conditions precedent to a new set of contracts or whether they were a breach to the existing contract." (Doc. 30 at 22 (emphasis added)). Indeed, in so summarizing the

---

[14] Assuming Mr. Townson is correct in his characterization of Koch's requirements, he has never explained to the court how such excessiveness means that his breach of contract claim survives summary judgment if those demands do, in fact, constitute conditions precedent.

record, Mr. Townson has, in this court's view, implicitly acknowledged that if the record affirmatively shows that the repairs were conditions precedent to forming or triggering a delivery obligation under a new contractual arrangement, then Koch is entitled to summary judgment.

For those reasons stated above, this court finds that no reasonable jury could conclude that Koch's demands were anything but conditions precedent to either (i) Koch's formation of a future set of chicken grower contracts with Mr. Townson or (ii) Koch's obligation to deliver a flock to Mr. Townson under a newly formed (oral) arrangement with him. Further, because of Mr. Townson's ineffective efforts to rebut this prima facially established defense with the existence of <u>material</u> matters of disputed fact, Koch is entitled to summary judgment on Count One of Mr. Townson's complaint.[15]

### B.    Mr. Townson's Tortious Interference Claim

In Count Five of his complaint, Mr. Townson alleges that Koch interfered with the lending relationship that he had with FBS, including some loans insured by the United States Department of Agriculture's Farm Service Agency ("FSA"), "by not sending [Mr. Townson] anymore flocks." (Doc. 1-1 at 11 ¶ 49). Mr. Townson further

---

[15]    Accordingly, the court does not reach the merits of Koch's alternative limit-on-damages defense to Count One of Mr. Townson's complaint and that portion of Koch's Motion is due to be termed as moot.

maintains that "[w]ithout the flocks to grow and receive compensation as previously promised, [he] was unable to satisfy all of his obligations between [him], the [FBS] and the FSA." *Id*.

A claim of tortious interference requires proof of the following elements:

(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage.

*White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009).

In seeking summary judgment on this count, Koch contends that Mr. Townson's claim fails with respect to the third *prima facie* element–Mr. Townson cannot show that Koch was a stranger to his relationship with FBS. In making this argument, Koch correctly points out that its absence as an express party to the loan agreement is not determinative of its stranger status.

Instead, Alabama law provides:

Clearly, a party to a contract or a business relationship cannot be liable for tortious interference with that contract or business relationship. *Colonial Bank v. Patterson*, 788 So. 2d 134, 137 (Ala. 2000); *Ex parte Blue Cross & Blue Shield, Inc.*, 773 So. 2d 475, 480 (Ala. 2000). Parsons makes it clear that a plaintiff asserting a tortious-interference claim bears the burden of proving that the defendant is a "third party" or "stranger" to the contract or business relationship with which the defendant allegedly interfered. *See also BellSouth Mobility, Inc. v. Cellulink, Inc.*, 814 So. 2d 203, 212 (Ala.2001). A defendant is a party in interest to a relationship if the defendant has any beneficial or economic interest in, or control over, that relationship. *Parsons*, 849 So. 2d at 937; *BellSouth*, 814 So. 2d at

214; *Colonial Bank*, 788 So. 2d at 139; *Blue Cross*, 773 So. 2d at 480.

In *Parsons*, we concluded that a father who participated in his son's decisions regarding the son's health-club business was not a stranger to the relationship between the health club and the plaintiff, who had been discharged from his employment with the health club. In *BellSouth*, we concluded that the plaintiff could not maintain a tortious-interference action in the context of a three-way relationship, where the parties were mutually dependent upon one another, because, in that context, the plaintiff could not establish, as a matter of law, that the defendant was a stranger to the relationship. <u>We held that where a contract would not have been consummated without the participation of a certain party, that party is "anything but a stranger to the relationship."</u> 814 So. 2d at 214.

*Waddell & Reed, Inc. v. United Investors Life Ins.*, 875 So. 2d 1143, 1154 (Ala. 2003).

As the *Waddell* court further explained the meaning of stranger status:

In reaching our decisions in *Parsons* and *BellSouth*, we relied upon Georgia law. *See, e.g., Atlanta Market Ctr. Mgmt. Co. v. McLane*, 269 Ga. 604, 608, 503 S.E. 2d 278, 282 (1998), which this Court embraced in *Parsons* and *BellSouth*. In *Atlanta Market Center*, the Supreme Court of Georgia stated:

"After proving the existence of a contract, it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a 'third party,' *i.e.*, a 'stranger' to the contract with which the defendant allegedly interfered. <u>One is not a stranger to the contract just because one is not a party to the contract</u>, as it has been held that the alleged interferer is not a stranger to the contract and thus not liable for tortious interference where the alleged interferer was the agent for one of the parties to the contract of insurance (i.e., the underwriter), and all the purported acts of interference were done within

21

the scope of the interferer's duties as agent. *Jet Air v. National Union Fire Ins. Co.*, 189 Ga. App. 399, 375 S.E. 2d 873 (1988)."

269 Ga. at 608, 503 S.E. 2d at 282. The Court then concluded:

> "In *Jefferson–Pilot Comm. Co. v. Phoenix City Broadcasting*, 205 Ga. App. 57, 60, 421 S.E. 2d 295 (1992), the shadow of liability for tortious interference was further diminished when the Court of Appeals reasoned that 'all parties to a comprehensive interwoven set of contracts which provided for the financing, construction, and transfer of ownership' were not strangers, *i.e.*, the purchaser of a radio station was not a stranger to the contractual relations between the radio station's seller and the seller's lenders. Thus, in order for a defendant to be liable for tortious interference with contractual relations, the defendant must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract."

269 Ga. at 609, 503 S.E. 2d at 283.

*Waddell*, 875 So. 2d at 1154-55 (emphasis added).

Against this backdrop, no reasonable jury could conclude that Koch was a stranger to Mr. Townson's lending relationship with FBS. In particular, Koch has established that FBS would not have made the initial loan to Mr. Townson without his providing either a pullet contract or a letter of intent from Koch, as the integrator. Further, the record shows that Koch faxed such a letter of intent to FBS prior to Mr. Townson's closing on his loan.  Additionally, the record reflects that Mr. Townson's loan for the purchase of the farm was conditioned upon an assignment of future

payments from Koch to FBS and Koch agreed to make payments directly to FBS. Therefore, Koch was far from a stranger and, instead, was an integral party to the establishment of Koch and FBS's lending relationship.[16]

Nor does Mr. Townson's mere assertion that Koch was a stranger to subsequent loans between him and FBS save his tortious interference claim. (*See* Doc. 30 at 17 ("Unlike the initial loan to purchase the farm, Koch was not involved in the loans for things such as the purchase [of] a tractor.)). In suggesting this tenuous loan specific theory, Mr. Townson offers no supporting authority.

Further, his position is irreconcilable with the Supreme Court of Alabama's express embrace of Georgia's interference law, which requires a plaintiff to establish a defendant's distance from not only the contract, but also "the business relationship giving rise to and underpinning the contract." *Wallace*, 875 So. 2d at 1155 (quoting *Atlanta Market Center*, 269 Ga. at 609, 503 S.E. 2d at 283). Consequently, consistent with *Wallace*'s framework, Koch's instrumental involvement at the inception of Mr. Townson's lending relationship with FBS extends Koch's non-stranger status to those subsequent equipment and other farm-

---

[16] Mr. Townson has apparently abandoned any tortious interference theory tied to the FSA, the insurer of Mr. Townson's initial loan with FBS, as his opposition brief focuses solely upon his relationship with FBS. However, these foregoing reasons similarly establish that Koch was not a stranger to the commercial relationship shared between Mr. Townson and FSA–without Koch's letter of intent there would have been no loan to Mr. Townson by FBS for the FSA to insure.

related loans arising out of that same commercial relationship.

To the extent that Mr. Townson seeks to avoid summary judgment in his opposition brief by linking his tortious interference claim against Koch to his relationships with other banks, these efforts are unavailing because his complaint limits his allegations to the negative impact on his financial relationship with FBS. From a procedural standpoint, the Eleventh Circuit has made it unmistakably clear that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). *Gilmour* dealt with a plaintiff who was attempting to assert a new claim at the summary judgment stage. *Gilmour*, 382 F.3d at 1314-15.

Additionally, a more recent decision by the Eleventh Circuit cites to *Gilmour* and confirms that a district court's consideration of <u>any critical amendment</u> asserted merely as part of the briefing process is disfavored.

> The current practice in some district courts—especially in the summary judgment setting—is to ignore what the respective parties alleged in their complaint and answer and to consider their claims and defenses as depicted in the memoranda they filed in support of or in opposition to a motion for summary judgment. As is the situation here, <u>the claims and defenses presented in the memoranda supporting or opposing summary judgment are not presented in the complaint and answer</u> with the specificity required by the Federal Rules of Civil Procedure and the Supreme Court's decisions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); rather, they are presented in a shorthand fashion. The result is that on appeal we have difficulty in determining whether the district court, in granting summary judgment, ruled on the claims and defenses as stated in the complaint and answer or as stated in the memoranda submitted to the court on summary judgment, as if the pleadings had been amended by implied consent.

We encountered this dilemma most recently in *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S. Ct. 856, 184 L. Ed.2 d 656 (2013). There, in their motion for summary judgment, the plaintiffs sought to eliminate a critical deficiency in the allegations of their amended complaint by including additional facts. The defendants did not object to this tactic on the ground that the plaintiffs were, in effect, seeking to amend their complaint. And the district court, in ruling on the sufficiency of the complaint, appeared to have considered the additional facts as if they had been alleged in the complaint. In affirming the district court's dismissal of the claim at issue, we refused to consider these additional facts, citing precedent that precludes a plaintiff from amending its complaint "through argument at the summary judgment phase of proceedings." *Id.* at 1258 n. 27. "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

This court's precedent foreclosed Well–Come's attempt to amend its complaint at the summary judgment stage without seeking leave of court pursuant to Rule 15(a)(2). Accordingly, the District Court should have disposed of Well–Come's claim with a statement that Well–Come failed to establish that ASRRG and ASIS issued a commercial general liability policy and excess/umbrella liability policy to Flintlock LLC, as alleged in paragraphs 6 and 7 of its complaint. We affirm the court's judgment on that ground. *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010) ("This court may affirm a decision of the district court on any ground supported by the record.").

*Flintlock Const. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1227-28

(11th Cir. 2013) (emphasis added).

Mr. Townson's complaint does not advance any tortious interference theory against Koch that is tied to his failed relationships with other banks. Thus, *Gilmour* and *Flintlock* procedurally foreclose Mr. Townson from belatedly attempting to amend his complaint in such a critical manner through his briefing. Consequently, for all these reasons, summary judgment is due to be entered in favor of Koch on Count Five of Mr. Townson's complaint.

## IV.   Conclusion

For the reasons explained above, Koch's Motion is due to be granted in part and otherwise termed as moot. Further, Mr. Townson's complaint is due to be dismissed with prejudice. The court will enter a separate final judgment order consistent with this memorandum opinion.

**DONE** and **ORDERED** this 1st day of December, 2014.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

26